

# IN THE
# TENTH COURT OF APPEALS

## No. 10-08-00120-CR

**MIGUEL ARCIBA,**

**Appellant**

 **v.**

**THE STATE OF TEXAS,**

**Appellee**

### From the 40th District Court
### Ellis County, Texas
### Trial Court No. 31884CR

## MEMORANDUM OPINION

Miguel Arciba was convicted of capital murder by a jury. TEX. PEN. CODE ANN. § 19.03 (Vernon 2003). He was sentenced to a mandatory sentence of life imprisonment in the Texas Department of Criminal Justice – Institutional Division. TEX. PEN. CODE ANN. § 12.31 (Vernon 2003). Arciba raises ten issues on appeal. Arciba complains that the trial court erred in denying his motion to quash his indictment. He further complains that the trial court erred in denying his motion to suppress based on involuntariness due to religious coercion, the totality of the circumstances, direct promises, threats, and misrepresentations made by law enforcement, violation of his right to counsel,

improper *Miranda* warnings, and an illegal arrest, search, and seizure. Arciba also complains that the trial court erred in failing to suppress hair comparison analysis evidence and DNA evidence. Because we find that the trial court did not err, we affirm the judgment of conviction.

*Factual Background*

Doris Phillips was reported missing from her rural residence on July 25, 2006. The back door to her residence had been left open, her television was left on, and there were other signs that she had departed suddenly, and likely, unwillingly. A shotgun and a jewelry box were also determined to be missing from the home.

During the investigation and search for Mrs. Phillips, Arciba was interviewed at the sheriff's office on August 7, 2006. Arciba admitted to knowing Mrs. Phillips and speaking with her about buying a pickup and camper. Arciba voluntarily came to the sheriff's office for that interview and left when it was over.

On September 2, 2006, the missing shotgun was found by chance at a flea market in Canton. Arciba was determined to have been the person who sold the shotgun to the vendors at the flea market. Four law enforcement officers went to Arciba's residence at some time after 7:00 a.m. on the morning of September 3, 2006 because they could not reach Arciba by phone and had no other way to contact him. Arciba left with the officers to be questioned further about the shotgun and rode in a law enforcement vehicle. One of the officers drove Arciba's vehicle to the sheriff's office because the officers had smelled alcohol in Arciba's apartment and were concerned about his sobriety. Arciba was told by the officers that he was not under arrest at that time.

At the station, after receiving his *Miranda* warning and waiving his constitutional rights,[1] Arciba initially denied any knowledge of the shotgun. After the investigators informed Arciba that they knew he had been in possession of the shotgun, he changed his story and stated that he had purchased the shotgun from another person in a written statement. A warrant was then procured for Arciba's arrest for burglary of a habitation. Arciba was arrested while he was still at the sheriff's department in the evening of September 3, 2006.

Arciba was taken before a magistrate at approximately 6:30 a.m. on September 4, 2006, and bond was set on the burglary charge. On September 5, 2006, a search warrant was issued for Arciba's vehicle which was stored at the sheriff's department, having been impounded when Arciba was arrested.

Arciba was questioned for varying periods of time daily, portions of which were videotaped. Arciba voluntarily participated in two polygraph examinations. His next written statement was made on September 6, 2006, in which he admitted to being inside Mrs. Phillips's house and stealing the shotgun and jewelry box.

Toward the end of the week of questioning, different law enforcement officers would pray with Arciba at the beginning and end of each period of questioning. One in particular, Chief Sullins, had known Arciba's family for many years and knew that

---

[1] Arciba was actually given the warnings enumerated in Texas Code of Criminal Procedure art. 38.22, which also include the right to terminate the interview at any time; however, Arciba couches his arguments solely in terms of the requirements of *Miranda v. Arizona*. *Miranda v. Arizona*, 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602 (1966). Therefore, we refer to the warnings throughout this opinion as *Miranda* warnings.

Arciba's mother was in poor health. The officers instigated the prayers, which included prayer for Arciba's mother and for the return of Mrs. Phillips.

On September 7, 2006, Chief Sullins was about to begin questioning Arciba. Sullins advised Arciba that as they had discussed the previous day, he had visited Arciba's mother the night before. After praying with Arciba, Chief Sullins showed him a photograph of his mother and a photograph of Mrs. Phillips. Upon seeing these photos, Arciba had a medical episode of some type where he collapsed, fell out of his chair onto the floor, and seemed to shake for a short period of time. Emergency medical attention was given to Arciba, and questioning ended for that day.

Arciba made two written statements on September 8, 2006. The first was made at 4:14 p.m., wherein Arciba admitted to being present in Mrs. Phillips's house with another person named Israel Valdez when Mrs. Phillips was injured. Arciba claimed that Valdez had pushed Mrs. Phillips hard which caused her to fall. Arciba picked her up and put her in a chair. Arciba went outside until Valdez called him to come back inside. Arciba saw Valdez walking with Mrs. Phillips to Arciba's car in the driveway. Arciba took the shotgun and jewelry box. Valdez told Arciba he was going to leave Mrs. Phillips at a white house. Arciba demanded to be left at a nearby bar, and Valdez dropped him off. Arciba contends that Mrs. Phillips was still breathing at that point. Valdez came back to the bar later and then after some time, left.

Sometime after this statement was made, law enforcement officials took Arciba to his mother's house. Arciba had been expressing concern about his mother to law enforcement at various points during the questioning. Arciba's sister was present as

well. At first, Arciba did not want to go in and upset his mother, but ultimately did so. Two Spanish-speaking officers went in as well and listened to the conversation. Arciba's mother told Arciba to tell the police the truth. Arciba and his mother were both very emotional at this meeting.

Arciba then asked for two specific investigators to come to him and that he would take them to where Mrs. Phillips's body was located. Arciba led the investigators to a white house where Mrs. Phillips's badly decomposed body was located. Upon returning to the sheriff's office, he made yet another written statement wherein he added details such as what Mrs. Phillips was wearing and that Valdez had told him that he was going to leave the body at the white house near Bardwell where her body was ultimately found.

During the search of Arciba's car, a knife with blood on it, a bracelet later determined to belong to Mrs. Phillips, and some gray hairs were located in the vehicle. Through DNA testing, the blood and hairs were determined to match Mrs. Phillips's DNA.

Arciba filed multiple motions to suppress his statements and the evidence discovered in the vehicle. After a hearing, the trial court denied the motions and made written findings of fact and conclusions of law. We will later address those findings as relevant to the disposition of the appeal.

### Motion to Quash the Indictment

In his first issue, Arciba complains that the trial court erred in denying his motion to quash his indictment.

*Standard of Review*

The Court of Criminal Appeals has recently reiterated the standard of review for a motion to quash an indictment:

> The sufficiency of an indictment is a question of law and is reviewed de novo. *State v. Moff*, 154 S.W.3d 599, 601 (Tex. Crim. App. 2004) (citing *Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997)). The right to notice is set forth in both the United States and Texas Constitutions. *See* U.S. CONST. amend. VI; TEX. CONST. art. I, § 10. In addition, the Texas Code of Criminal Procedure provides guidelines relating to the sufficiency of an indictment. *See, e.g.*, Articles 21.03, 21.04, and 21.11. Thus, the indictment must be specific enough to inform the defendant of the nature of the accusations against him so that he may prepare a defense. *Moff*, 154 S.W.3d at 601. However, the due-process requirement may be satisfied by means other than the language in the charging instrument. *Kellar v. State*, 108 S.W.3d 311, 313 (Tex. Crim. App. 2003). When a motion to quash is overruled, a defendant suffers no harm unless he did not, in fact, receive notice of the State's theory against which he would have to defend. *Id.*; *see also* Art. 21.19 ("An indictment shall not be held insufficient, nor shall the trial, judgment or other proceedings thereon be affected, by reason of any defect of form which does not prejudice the substantial rights of the defendant").

*Smith v. State*, No. AP-75,479, 2009 Crim. App. LEXIS 527 at *8 (Tex. Crim. App. May 6, 2009).

*The Indictment*

Arciba complains that the trial court should have quashed the indictment in his case for lack of specificity regarding the specific acts he is alleged to have committed, more specifically, the multiple manners and means that were alleged in the indictment. The indictment stated in part that Arciba had caused the death of the victim "by striking her with a hand, a foot or an object unknown to the Grand Jury, by striking, cutting or stabbing her with a knife or other object unknown to the Grand Jury, by

pushing or shoving her down or into an object unknown to the Grand Jury, or by manner and means unknown to the Grand Jury . . . ."

An indictment may allege the several ways and means by which the proof suggests a homicide was committed. *Zanghetti v. State*, 618 S.W.2d 383, 386 (Tex. Crim. App. [Panel Op.] 1981). An indictment for murder may, in a single count, allege jointly different means of killing without rendering the indictment duplicitous. *Gentry v. State*, 356 S.W.2d 793 (Tex. Crim. App. 1962). Further, an indictment alleging several means of killing in the same count of the indictment, one of which is "in some manner and by some means, instrument or weapon to the grand jury unknown" has been found not to be improper. *Helmus v. State*, 397 S.W.2d 437, 439-440 (Tex. Crim. App. 1965). We do not find error in the trial court's denial of Arciba's motion to quash the indictment. Arciba's first issue is overruled.

### Motions to Suppress

Arciba filed multiple motions to suppress his "admissions or confessions" as well as the hair and DNA evidence found in his vehicle which linked him to the victim.

### Standard of Review on Motion to Suppress

The trial court is the "sole and exclusive trier of fact and judge of the credibility of the witnesses" and the evidence presented at a hearing on a motion to suppress, particularly where the motion is based on the voluntariness of a confession. *Delao v. State*, 235 S.W.3d 235, 238-39 (Tex. Crim. App. 2007); *Green v. State*, 934 S.W.2d 92, 98-99 (Tex. Crim. App. 1996). Additionally, given this vital role, great deference is accorded to the trial court's decision to admit or exclude such evidence, which will be overturned

on appeal only where a flagrant abuse of discretion is shown. *Montanez v. State*, 195 S.W.3d 101, 106 (Tex. Crim. App. 2006); *Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997); *Alvarado v. State*, 912 S.W.2d 199, 211 (Tex. Crim. App. 1995). We afford almost total deference to the trial court's determinations of historical facts, especially when those determinations involve assessment of witness credibility and demeanor. *See Masterson v. State*, 155 S.W.3d 167, 170 (Tex. Crim. App. 2005).

### *Illegal Arrest*

Arciba complains that the actions of law enforcement escorting him from his home constituted an illegal arrest and that his car keys were unlawfully seized by law enforcement at that time. While Arciba describes his version of events, there is no authority and very little argument cited by Arciba to support an unlawful seizure. We find this portion of the issue is inadequately briefed, and therefore, is waived. *See* TEX. R. APP. P. 38.1(i). *See also Wyatt v. State*, 23 S.W.3d 18, 23 n.5 (Tex. Crim. App. 2000).

Arciba contends in his brief that the four law enforcement officers appeared at his residence at an unreasonable hour, placed him in handcuffs, took his car keys without his consent from his niece who was also present, and forced him to go to the sheriff's department with them. Yet, Arciba concedes that the handcuffs were removed prior to his entering the police vehicle. Arciba did admit that the officers told him he was not under arrest in his residence. Arciba's niece, who was also present, testified that Arciba was handcuffed by law enforcement who took the keys from her without asking for consent.

Each of the four law enforcement officers that were present that morning at Arciba's residence testified at the suppression hearing. Their testimony was that they came to Arciba's residence sometime after 7:00 a.m. on September 3, 2006 because they had no other way to contact him. A person other than Arciba answered the door to the residence. The officers asked to speak with Arciba. He was sleeping in a back bedroom. Arciba came out of the bedroom and the officers asked him to accompany them to the sheriff's department for some questioning. Arciba was allowed to change clothes prior to their departure. Arciba's apartment had a strong smell of alcohol and Arciba had been out drinking the night before until 3:30-4:00 a.m. The officers were concerned for Arciba's ability to safely drive himself, so one of the officers volunteered to drive Arciba's car so that Arciba would have a way to come home after the questioning. Each officer denied handcuffing Arciba at any time. Arciba willingly gave them his car keys. Arciba voluntarily traveled with the officers and rode in the front passenger seat of one of the officers' vehicles.

The trial court made the following findings of fact:

- The law enforcement officers went to Arciba's residence to contact Arciba to interview him related to his possession of the shotgun in August, 2006.

- The investigators requested Arciba to accompany them to the sheriff's office regarding the missing shotgun. The investigators detected an odor of alcohol about Arciba. Arciba voluntarily agreed to accompany the officers and rode with an investigator.

- Testimony that Arciba was handcuffed and was placed under arrest at the time he accompanied the investigators was found to be not credible and not true.

- A red 1997 Ford Escort vehicle was identified as a vehicle commonly used by Arciba. It was driven to the sheriff's office by an investigator so that Arciba would have the means to leave at the end of the interview.

As the trial court is the sole judge of the credibility of the witnesses and the weight of their testimony, we conclude the trial court's findings and conclusions are supported by the record. *See Wyatt*, 23 S.W.3d at 23; *Penry*, 903 S.W.2d at 744. We overrule Arciba's issue eight.

## *Unlawful Search*

Arciba complains that the entry of law enforcement into Arciba's residence without a warrant, the taking of his keys, and a search of his vehicle he alleges was undertaken enroute to the sheriff's office constituted an illegal search. However, beyond some general citations regarding inventory searches of vehicles and that an unconsented police entry into a residence is a search, Arciba makes no argument and cites no authorities as to what the search consisted of, in what manner it was illegal, or what evidence should be suppressed as a result. We will not make Arciba's arguments for him and hold the allegation to be inadequately briefed and, therefore, issue seven is waived and overruled. *See* TEX. R. APP. P. 38.1(h) and (i). *Wyatt v. State*, 23 S.W.3d at 23 n.5.

## *Voluntariness of Confession*

Arciba complains in issues two, three, five, and six that for various reasons, the confessions he made were involuntary and should not have been admissible in his trial. Issue two complains that the police used religious appeals to coerce a confession. Issue three complains that the totality of the circumstances surrounding the interrogation

were coercive and caused Arciba's will to be overborne, which should render his confessions involuntary and therefore inadmissible. Issue five complains that direct promises, misrepresentations, and threats by law enforcement against Arciba rendered his "statements and admissions" inadmissible. Issue six complains that the *Miranda* warnings given to him were insufficient and therefore resulted in Arciba involuntarily waiving his rights.

We note that only in issue three in Arciba's brief does Arciba make any reference to what evidence he complains of as being wrongfully not suppressed by the trial court, the two written statements he made on September 8, 2006. Arciba also mentions only in issue two that all "fruits" of the coerced statements should be suppressed as well, but never defines what those fruits are said to encompass. We therefore limit our analysis of the "fruits" to the two written statements Arciba gave to law enforcement on September 8, 2006. The suppression of any other statement or evidence is inadequately briefed, and therefore, waived. *See* TEX. R. APP. P. 38.1(h) and (i). *See also Walder v. State*, 85 S.W.3d 824, 828 (Tex. App.—Waco 2002, order) (per curiam).

The determination of whether a confession is voluntary is based on an examination of the totality of circumstances surrounding its acquisition. *Wyatt v. State*, 23 S.W.3d 18, 23 (Tex. Crim. App. 2000) (*citing Penry v. State*, 903 S.W.2d 715, 744 (Tex. Crim. App. 1995)). At a suppression hearing, the trial court is the sole judge of the credibility of witnesses and the weight of their testimony. *Id*. Therefore, we will not disturb the trial court's findings if those findings are supported by the record. *Id*. We will only consider whether the trial court properly applied the law to the facts. *Id*.

*Religious Coercion*

Arciba's issue number two complains that "The Religious Appeals by Law Enforcement and All Fruits Thereof, were the results of Coercion and Thus Involuntary and should therefore have been supressed [sic]." Within this point of error, Arciba avers that his *Miranda* waivers were immaterial because of the coercion by law enforcement, and that the deceit and trickery used by the law enforcement officials deprived Arciba of the ability to make an unconstrained, autonomous decision to confess. Further, Arciba contends that the trial court erred in not suppressing the "fruits" of Arciba's statements, with no reference to what those "fruits" are.

The trial court found that officers prayed with Arciba during several interviews, and that the last interview with Arciba where two law enforcement officers prayed with Arciba was not an interrogation. The trial court did not otherwise address the prayers in its findings of fact, but in its conclusions of law stated that "praying with the defendant was not coercion, duress or undue influence so as to cause him to give a false statement."

We have located no Texas cases dealing with the issue of religious coercion. The trial court viewed some of the prayers on the videos presented at the suppression hearing. As the determiner of the credibility of the witnesses, the trial court personally observed the testimony of the law enforcement officers and Arciba. Therefore, we defer to the trial court's findings that the prayers were not coercive in nature. *See Wyatt*, 23 S.W.3d at 23; *Penry*, 903 S.W.2d at 744. The United States Fifth Circuit Court of Appeals made a similar ruling in a Louisiana state case whereby an officer prayed with a

defendant for about three hours, during and after which the defendant made several incriminating statements. *See Welch v. Butler*, 835 F.2d 92, 95 (5th Cir. La. 1988), *cert. denied*, 487 U.S. 1221, 108 S. Ct. 2877, 101 L. Ed. 2d 912 (1988) (police using religious conviction to attempt to elicit confession not coercive under Fifth and Fourteenth Amendments of U.S. Constitution). We overrule issue two.

*Totality of the Circumstances*

Arciba's issue number three complains that the totality of the circumstances show that any admissions or statements made by Arciba were the result of his will being overborne and thus involuntary. "Voluntariness is decided by considering the totality of the circumstances under which the statement was obtained." *Creager v. State*, 952 S.W.2d 852, 855 (Tex. Crim. App. 1997). The ultimate question is whether Arciba's will was "overborne" by police coercion. *Id.* at 856. In answering this question, courts may consider various factors, including the length of detention, incommunicado or prolonged detention, denying a family access to a defendant, refusing a defendant's request to telephone a lawyer or family, and physical brutality. *Nenno v. State*, 970 S.W.2d 549, 557 (Tex. Crim. App. 1998), *overruled on other grounds, State v. Terrazas*, 4 S.W.3d 720, 727 (Tex. Crim. App. 1999).

Arciba contends that the length of the interrogations over the span of six days led to his exhaustion and health issues and that the misleading nature of the questioning by law enforcement renders the two statements he made on September 8, 2006 as involuntarily given due to the coercive atmosphere in which they transpired.

The trial court, in its findings, stated that the length of interrogations was not unduly long or so onerous as to constitute coercion, duress, or undue influence. Further, the trial court found that Arciba was allowed breaks, given the opportunity for meals, allowed the use of tobacco, and allowed to sleep. Additionally, the trial court found that the interviews were generally amicable and without coercion, duress, or undue influence, that Arciba was repeatedly given the warnings required by art. 38.22 of the Texas Code of Criminal Procedure, that he knew and understood those rights and voluntarily waived them, and that Arciba willingly engaged in discussions in an attempt to convince the investigators that he was not responsible for the offense.

As we defer to the trial court's credibility determinations, we cannot say the trial court erred by finding that Arciba's oral statements were voluntarily given. *See Wyatt,* 23 S.W.3d at 23; *Penry*, 903 S.W.2d at 744. We overrule issue three.

*Direct Promises, Misrepresentations, and Threats*

Arciba complains in issue five that the law enforcement officers engaged in deception by using his mother as an "extrinsic consideration." Later, he alludes to the idea that this constituted "a plausible threat to pray [sic] on the frailty and health of his mother whom was so dear." However, Arciba presents no authority or references to the record to support his position. Therefore, this portion of this issue is inadequately briefed, and therefore, waived. *See* TEX. R. APP. P. 38.1(h) and (i).

Next in this issue, Arciba contends that the totality of the circumstances made his statement involuntary. We have already resolved this issue against Arciba in our discussion of issue number three. Then, Arciba complains about involuntary

statements, admissions, and confessions resulting from one law enforcement officer's false representation that whatever Arciba said would stay in the room and no one would know what he said. This transpired during the second polygraph session on September 8, 2006, which was videotaped without the knowledge or consent of the polygraph examiner, in violation of the policies of the United States Secret Service which conducted the polygraph. Arciba then refers back to the issue of references to his mother and her poor health. Arciba does not explain what effect, if any, these alleged issues had on him other than as an extension of his totality argument. We cannot determine with any degree of certainty what this multifarious issue is complaining of and what relief Arciba is requesting from it. *See* TEX. R. APP. P. 38.1(i). Therefore, it is waived. Issue number five is overruled.

*Waiver of Rights*

Arciba complains that he was given insufficient *Miranda* warnings prior to giving an oral or written confession, which rendered the waiver involuntary. *See Miranda v. Arizona*, 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602 (1966). Arciba mentions the Texas Code of Criminal Procedure in the heading of this issue but does not refer to it in the body of his argument. Therefore, we will only construe his complaint as a failure to give proper *Miranda* warnings. We also note that Arciba does not refer to any particular oral statements; therefore, we will only discuss the written statements. *See* TEX. R. APP. P. 38.1(i).

Arciba contends that he was unable to read the written *Miranda* warnings which were listed at the top of each page of his written statements because he did not have his

reading glasses. Arciba does not deny that he placed his initials on each line next to each right that is required to be given and waived by *Miranda* on each of the four written statements taken that week or that he signed each page of the written statements at the bottom. Arciba makes one blanket statement that he "was unable to read and fully understand the Waiver of Rights documents with *Miranda* warnings on statement giving [sic] September 3, 2006, September 6, 2006, September 8, 2006 and September 9, 2006." Arciba makes no citations to the record to advance this argument.

Arciba does, however, quote a section of testimony shown on a video of the questioning of September 7, 2006, whereby Chief Sullins gave Arciba his reading glasses to review a waiver of rights statement. No written statement or admission was made on that day by Arciba. In addition, Arciba admitted at the suppression hearing that he knew that he had each of the rights enumerated in *Miranda* prior to signing the written statements, that he had initialed each line next to each one as listed after receiving them, and that he signed those waivers voluntarily. The trial court found that Arciba was not prevented from reading documents, and when given reading glasses, he read documents without complaint.

The trial court's findings of fact regarding this issue for each written statement were that "Arciba knew he had a right to an attorney, knew he did not have to make a statement, was advised of his statutory rights, freely and voluntarily provided the statement, and was not under duress or subject to coercion."

Arciba also argues that an investigator's failure to read the rights verbatim to him on one occasion renders the waivers insufficient. The occasion Arciba advances

was prior to his taking a polygraph examination on September 8, 2006, and no written statement was made in that examination. However, Arciba does not explain how this failure, if any, rendered any statement as involuntary. Further, the trial court's findings are supported by the record. *See Wyatt,* 23 S.W.3d at 23; *Penry*, 903 S.W.2d at 744. Issue number six is overruled.

### *Denial of Right to Counsel*

Arciba complains in issue four that the trial court erred by not suppressing his statements and admissions because Arciba requested an attorney during his first interview. Arciba points to no specific statements or admissions that he made that he now complains about beyond the statement that "appellant challenges the trial court's finding that he reinitiated conversation with police."

Arciba's heading of his fourth issue mentions this asserted violation as one encompassing the Fifth and Sixth Amendments to the United States Constitution. Arciba makes no further reference to the Sixth Amendment. We will not make Arciba's arguments for him and hold this allegation to be inadequately briefed, and therefore, waived. *See* TEX. R. APP. P. 38.1(h) and (i). *Wyatt v. State*, 23 S.W.3d at 23 n.5.

Regarding Arciba's Fifth Amendment claim, Arciba testified at the suppression hearing that he was not given his *Miranda* warnings and that he requested an attorney at the first interview with law enforcement on September 3, 2006, but that his request was ignored. The officers involved in the questioning of Arciba each testified that Arciba was repeatedly given his *Miranda* warnings, including prior to the beginning of

the questioning on September 3, 2006. The officers further testified that Arciba never invoked his right to counsel during the entire time he was questioned.

The trial court made the following findings of fact regarding September 3, 2006 and Arciba's request for counsel:

- Arciba was interviewed and provided oral and written statements. Arciba voluntarily provided the statements and was not in custody. Arciba was also advised of his rights. There was no coercion, duress, and no request for an attorney regarding the voluntary statements. Testimony by Arciba that he requested an attorney was determined not credible and not true.

As the trial court is the sole judge of the credibility of the witnesses and the weight of their testimony, we conclude the trial court's findings and conclusions are supported by the record. *See Wyatt*, 23 S.W.3d at 23; *Penry*, 903 S.W.2d at 744. We overrule issue four.

*Admissibility of Scientific Evidence*

Arciba also contends in issues nine and ten that the scientific evidence found during the investigation should have been suppressed by the trial court. Texas Rule of Evidence 702 provides: "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise." TEX. R. EVID. 702. The trial court's task in assessing admissibility under Rule 702 is to determine whether the scientific evidence is sufficiently reliable and relevant to help the jury in reaching accurate results. *Hartman v. State*, 946 S.W.2d 60, 62 (Tex. Crim. App. 1997); *Kelly v. State*, 824 S.W.2d 568, 572 (Tex. Crim. App. 1992). To be considered reliable, evidence

based on a scientific theory must satisfy three criteria: (1) the underlying scientific theory must be valid; (2) the technique applying the theory must be valid; and (3) the technique must have been properly applied on the occasion in question. *Hartman*, 946 S.W.2d at 62; *Kelly*, 824 S.W.2d at 573. *Kelly* also provided a list of non-exclusive factors that could affect a trial court's determination of reliability. These are: (1) the extent to which the underlying scientific theory and technique are accepted as valid by the relevant scientific community, if such a community can be ascertained; (2) the qualifications of the expert(s) testifying; (3) the existence of literature supporting or rejecting the underlying scientific theory and technique; (4) the potential rate of error of the technique; (5) the availability of other experts to test and evaluate the technique; (6) the clarity with which the underlying scientific theory and technique can be explained to the court; and (7) the experience and skill of the person(s) who applied the technique on the occasion in question. *Kelly*, 824 S.W.2d at 573.

Before novel scientific evidence may be admitted under Rule 702 the proponent must persuade the trial court, by clear and convincing evidence, that the evidence is reliable and therefore relevant. *Kelly*, 824 S.W.2d at 573.

*Hair Evidence*

Arciba asserts that the trial court erred in admitting the testimony of the State's expert, Juan Rosas, who is a forensic chemist and hair-comparison analyst with the Texas Department of Public Safety. Rosas compared the hair retrieved from the victim to the hair removed from Arciba's vehicle. Arciba sought to prevent the jury from

hearing the results of this comparison because it is scientifically unreliable and because its admission was more prejudicial than probative to Arciba.

The trial court held a hearing on Arciba's motion to suppress to determine the admissibility of Rosas's testimony. Rosas testified that he had received his training in hair-comparison analysis at the DPS headquarters in Austin. Rosas had been a forensic chemist with DPS for twenty-six years at the time of his testimony, and had been performing hair-comparison analysis since 1984. In order to become a qualified hair-comparison analyst he had to complete DPS training in forensic-hair comparison and work on various hair-comparison cases under direct supervision. Rosas continues his training by taking courses offered by the FBI and DPS. Rosas explained how he tested the hair found in Arciba's vehicle to the hair taken from the victim's head. He performed the test at the Austin DPS lab. Rosas testified that hair-comparison analysis is considered an accepted science within the scientific community and that there is literature on this topic. Persons performing hair-comparison analysis follow the same test procedures. When making the hair-comparison analysis in this case, Rosas followed the same techniques and procedures. The results of his testing were peer reviewed as they are in every case. Hair-comparison analysis can be explained in court.

The trial court denied the motion to suppress the hair-comparison analysis and allowed Rosas to testify before the jury. Rosas testified that the hairs found in Arciba's vehicle were microscopically consistent with those recovered from the victim.

*Reliability*

The State satisfied the three criteria stated in the *Hartman-Kelly* decisions. The proponent of the evidence testified that the underlying scientific theory is valid and that the technique applying the theory is valid; that the scientific community considers hair-comparison analysis an accepted science; and that all hair-comparison analysts, including Rosas, use the same scientific theory and technique when performing hair analysis. Rosas properly applied the technique in this case. The scientific theory and technique he used to perform the hair analysis are the same as those used by other analysts. There was evidence of Rosas's qualifications, experience, and skill to perform the test, the existence of literature supporting the underlying scientific theory and technique, the availability of other experts to test and evaluate the technique, and the clarity with which the underlying scientific theory and technique can be explained to the court.

*Relevancy*

Even if the proponent has satisfied the *Hartman-Kelly* criteria, the trial court may exclude the evidence if it determines that the probative value is outweighed by some factor identified in Rule 403. TEX. R. EVID. 403. The hair-comparison analysis is probative because it helps to show the similarity of the hair in Arciba's vehicle to the victim's hair. The evidence is not unfairly prejudicial, does not confuse the issues, does not mislead the jury, and is not cumulative. We hold that the evidence supports the trial court's findings and that the court did not abuse its discretion by admitting Rosas's testimony. We overrule issue nine.

*DNA Evidence*

Arciba complains of the trial court's error in denying his motion to suppress the DNA testing completed on the knife and hairs found in his vehicle because of the unlawful seizure of his person and his keys and the unlawful search of the vehicle. He further complains that the evidence should have been excluded by Texas Rule of Evidence 403 in that the prejudicial value of such evidence outweighs the probative value because of accuracy of testing procedures.

Arciba presents no authority in support of these claims. Therefore, this objection is inadequately briefed and presents nothing for our review. *See* TEX. R. APP. P. 38.1(h) and (i). *See also Walder v. State*, 85 S.W.3d 824, 828 (Tex. App.—Waco 2002, order) (per curiam). We overrule issue ten.

*Conclusion*

We find that the trial court did not abuse its discretion in its refusal to suppress evidence and in denying Arciba's motion to quash the indictment. We affirm the judgment of the trial court.


TOM GRAY
Chief Justice

Before Chief Justice Gray,
    Justice Reyna, and
    Justice Davis
Affirmed
Opinion delivered and filed December 30, 2009
Do not publish
[CRPM]